DMP:AAS/DKK
F. #2021R01028

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | **A M E N D E D   C O M P L A I N T   A N D   A F F I D A V I T   I N   S U P P O R T   O F   A R R E S T   W A R R A N T** |
| - against - | |
| QIMING LIN, | (18 U.S.C. §§ 371, 1028(a)(7), 1028(c)(3)(A) and 1028(f)) |
| Defendant. | |
| | No. 22-MJ-251 (MMH/JRC) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

JASON MORITZ, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

In or about and between September 2021 and March 2022, within the Eastern District of New York and elsewhere, the defendant QIMING LIN, together with others, did knowingly, willfully and with the intent to harass and intimidate, and place under surveillance with the intent to harass and intimidate, one or more persons, conspire to use one or more interactive computer services and electronic communication systems of interstate commerce, and one or more facilities of interstate and foreign commerce to place that person in reasonable fear of the death of, and serious bodily injury to, himself, and to engage in a course of conduct that caused, attempted to cause and would be reasonably expected to cause substantial emotional distress to a person, contrary to Title 18, United States Code, Sections 2261A(2)(A) and (2)(B).

(Title 18, United States Code, Section 371)

In or about and between September 2021 and March 2022, within the Eastern District of New York and elsewhere, the defendant QIMING LIN, together with others, did knowingly and intentionally conspire to transfer, possess and use, without lawful authority, and attempt to transfer, possess and use, without lawful authority, one or more means of identification of another person, to wit: the personal address and phone number of one or more victims, with the intent to commit, and to aid and abet, and in connection with, unlawful activity that constitutes a violation of Federal law, to wit: conspiracy to commit interstate harassment, and the transfer, possession, and use was in and affecting interstate and foreign commerce.

(Title 18, United States Code, Sections 1028(a)(7), 1028(c)(3)(A) and 1028(f))

The source of your deponent's information and the grounds for his/her belief are as follows:[1]

1.   I have been employed as a Special Agent by the Federal Bureau of Investigation ("FBI") since 2018.   During my tenure with the FBI, I have participated in numerous investigations, including investigations related to individuals located in the People's Republic of China ("PRC"), during the course of which I have, among other things: (a) conducted physical and electronic surveillance, (b) executed search warrants, (c) reviewed and analyzed recorded conversations and records, and (d) debriefed cooperating witnesses.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation.

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

2. The statements attributed to individuals in this Affidavit are set forth in sum, substance and in part unless otherwise indicated. Many of the statements attributed to individuals were originally made in Chinese and are summarized or quoted in this Affidavit based on draft translations, which are subject to change. I have personally reviewed the draft translation of each of the electronic communications, including emails and chat messages, described in this Affidavit, and participated personally in some of the interviews discussed herein. My knowledge of other interviews is based upon my review of reports and conversations with other law enforcement officers.

I. Background: The PRC Government's Suppression of Political Dissent

3. The PRC is a one-party state, the government of which is controlled by the Chinese Communist Party ("CCP").[2] The CCP often treats political dissent as a threat not only to its own political interests, but also to the PRC's one-party system of government. Thus, the PRC government's national security and law enforcement agencies often monitor and censor political speech that is deemed potentially damaging to the reputation of the PRC government or the CCP.

4. The PRC government's efforts to censor political dissent extends beyond the PRC's national borders. The PRC government, and in particular the Ministry of State Security ("MSS"), which is the foreign intelligence and secret police agency of the PRC government responsible for counterintelligence, espionage and political security, and the First Bureau of the Ministry of Public Security ("MPS"), often monitor, among others, Chinese political dissidents who live in the United States and in other locations outside the PRC. The

---

[2] The information set forth in this section is based on my review of publicly available information and my experience investigating numerous cases involving the PRC.

PRC government, the MSS, and the First Bureau of the MPS often use cooperative individuals both inside the PRC and around the world in an effort to influence, threaten and coerce political dissidents abroad.  Indeed, I am aware that agents of the PRC government have threatened and sought to coerce Chinese political dissidents living in the United States in an effort to silence disfavored political speech.

5. The June 4, 1989 Tiananmen Square massacre is one of the politically sensitive topics of discussion that is frequently censored by the PRC government.  On the night of June 3, 1989, into the morning of June 4, 1989, following weeks of large student-led protests advocating greater democratic representation for the people in the PRC's CCP-controlled system of governance, the People's Liberation Army ("PLA") violently crushed the protesters at Tiananmen Square and surrounding areas in Beijing, PRC during a state of martial law.  The PLA's crackdown led to the deaths of hundreds of PRC citizens and was widely condemned around the world.

II. The Criminal Scheme

6. The FBI and the U.S. Attorney's Office for the Eastern District of New York are investigating a scheme to undermine the candidacy of a U.S.-based Chinese dissident for the general election of 2022 to the U.S. Congress to prevent the candidate from drawing additional public attention to himself and his political speech.

7. The target of the PRC government's efforts is a former student leader of the Tiananmen Square protests from 1989, who later escaped to the United States and served in the U.S. military (the "Victim").  The Victim travelled to Hong Kong in 2015 to join pro-democracy demonstrations.  The Victim lives in the Eastern District of New York.

8. In or about September 2021, the Victim announced his intention to run for a U.S. congressional seat in the Eastern District of New York in the November 2022 general election. The primary for that election is scheduled to be held in or about June 2022.

9. In September 2021, a private investigator (the "PI")[3] reported to the FBI that he had recently been contacted by the defendant QIMING LIN, a person the PI characterized as a former police officer in the PRC who later joined the MSS. A photograph of LIN, who is a citizen of the PRC and resides in the PRC, is set forth below:



The PI indicated to the FBI his belief that LIN, whom the PI had previously met in New York, was now retired from the MSS. Based on the conduct summarized herein and my experience and training, I assess that LIN continued to act on behalf of the MSS even if ostensibly retired.

10. According to the PI, LIN contacted the PI via electronic chat and requested the PI to find information on the Victim, including his phone number, address, and vehicle. LIN instructed the PI to send any such information to LIN electronically. On or about September 22, 2021, the PI sent to an address LIN provided an email containing the Victim's

---

[3] The PI is a source of information for the FBI who has previously provided information to the FBI that has been corroborated by other evidence. The PI's communications with LIN described herein were made at the direction of the FBI.

phone number and residential address, as well as purported surveillance photographs of the Victim's residence. On or about September 23, 2021, the email address LIN provided to the PI forwarded the PI's email to an account known to be used by LIN.

11. On or about November 2, 2021, the PI participated in a monitored voice call with LIN. During the conversation, the PI and LIN made the following statements:[4]

> PI: Hello? Brother Ming! Hello, hello. Ok, because this person [the Victim] is a little complicated. So, we've decided that my partner and I are going to follow him for a few weeks to see what he has to see whom he gets in touch with, and where he frequents, etc.
>
> . . .
>
> LIN: Ok, good, good. And if you don't find anything after following him for a few weeks, can we manufacture something, like what happened to [a famous concert pianist (the "Pianist")]?

Based on my training and experience, as well as information gathered in the investigation, the reference to "manufactur[ing] something, like what happened to [the Pianist]" refers to an incident that occurred in Beijing, PRC, involving the Pianist, who was reportedly detained after allegedly being found in the company of a prostitute. The comment from LIN regarding the Pianist suggested the derogatory information regarding the Pianist may have been manufactured.

12. Later in the same conversation, the PI and LIN exchanged the following messages:

> PI: One more thing- no one here is touching this right? Because if we are going out there.
>
> LIN: No one is touching this. I am only coming to you for help. Don't worry. Currently, because you have not responded, we won't go find other people.

---

[4] All translations from Chinese are in draft form only and are subject to change.

Based on my training and experience, as well as information gathered in the investigation, the PI's question about whether anyone else was "touching this," and LIN's response, indicated that LIN had not engaged any other agents to assist in the scheme to undermine the Victim—in other words, LIN reassured the PI that he had hired only the PI to work on the scheme. LIN also indicated that he would figure out how to transfer money to the PI.

13. On or about November 9, 2021, the PI and LIN participated in another monitored voice conversation. During the conversation, LIN indicated that, if the Victim "passes the approvals" in the primary elections "next May," "then he will be elected to be a legislator. Right now we don't want him to be elected." As approximately a half of a year still remained before the primary, LIN indicated that he wanted the PI to see if there could be a scandal about the Victim that could be publicly released, such as an extramarital affair or "stealing water." Based upon my training and experience, my participation in the investigation and the forgoing, I assess that "stealing water" is Cantonese slang for stealing money. LIN asked that, if the PI could not uncover a scandal, then "can they create some?" In such a manner, LIN added, the Victim "won't get through in March/May," an apparent reference to the primary election. LIN further instructed the PI to involve the media and "to do everything at once." LIN then asked the PI for a proposal and to name a price.

14. On or about November 11, 2021, the PI and LIN participated in another recorded conversation. In the conversation, the PI indicated that he had determined the states of the Victim's residence since 1989, as well as the fact that the Victim had served in the U.S. military. LIN instructed the PI to "dig up things from 1989 to now . . . To see if there are any flaws before participating in the election now." LIN specified that "flaws" could include "unreported, unpaid taxes" or "[e]xtramarital affairs; affairs; uh, sexual harassment; or child

porn; eh, [homosexual activity], things of that nature." LIN suggested that the PI use "cops, or lawyers, or the courts . . . or some sort of channel . . . to see, to see if he had any flaws, we dig it back up." LIN further commented, "Right now-right now we will have a lot more-more of this in the future . . . Including right now [a] New York State legislator . . . ."[5] He then explained:

> [T]here are, uh, some-some, uh who speak negatively about China . . . The people who always speak up, you need to pay attention to them. If possible-possible to get some information, then this side will hold you in very high regards in the future.

I assess that "this side" was a reference to representatives and agents of the PRC government, such as the MSS. LIN then indicated that, if successful, the PI would receive "support," such as financial support from "some rich people." Based upon the forgoing and LIN's reference to people "who speak negatively about China," I further assess that LIN was seeking to undermine the Victim's candidacy because of the Victim's past status as a student leader of the Tiananmen Square protests in 1989.

15. In the same conversation, LIN indicated that the PI needed to undermine the Victim's candidacy "before getting power," that is, before publicly elected to office. To accomplish this goal, LIN suggested, "You go find a girl for him [the Victim], see if he would take the bait." At the conclusion of the conversation, LIN discussed how to make payment to the PI, indicating that he would potentially make an in-person payment to the PI after traveling to the United States following the 2022 Olympic Games in Beijing, PRC.

16. On or about December 8, 2021, the PI emailed LIN photos of the Victim driving to the post office. Additionally, the PI provided LIN with open-source documents about

---

[5] The name of the specified New York State legislator was inaudible.

the Victim's congressional campaign, including the "Statement of Organization for the Election."

17. On or about December 12, 2021, the PI sent a text message to LIN asking, "Did you look at the information [the PI had sent about the Victim]?" LIN responded, "I read it, but have to wait until next week, when the bosses gather together, to see what their opinion is." Based on this answer, I assess that LIN was taking directions from others in the scheme to interfere in the Victim's candidacy. Later, LIN added:

> Yeah, also, these are just very positive things . . . I saw . . . I personally feel these are very positive. Nothing special. The key is that what we want to say is . . . Like we said previously, you go find a girl . . . Or see how he . . . goes for prostitution, take some photos, something of that nature. See if you can get some internal information.

18. On or about December 24, 2021, LIN left the PI the following voice message:

> Still going back to what we said before . . . Which is I hope that it's not simply to slap some dirt on his face or whatnot, must go deep . . . Go deep and dig up something. Right? For example, past incidents of tax evasion. For example, if he used prostitutes in the past. For example, if he had a mistress. Right? His undisciplined way of living, right? Things that can become dirt. If you can find it, or to create one, then it's okay. Okay? Just taking photos, or chatting, that's useless. Right now, must get some dirt. Because we already know everything in his past. But how to fully use you, to dig up stuff on him. This is what you need to do. We don't need to do anything just on the surface, alright? Don-don't waste your energy.

19. Later that day, the PI participated in a monitored voice call with LIN to discuss strategy related to undermining the Victim's candidacy. During the conversation, LIN encouraged the PI to identify compromising information about the Victim, explaining that "[w]e already did all the work on the surface" to identify opportunities to undermine the Victim. LIN

suggested that the PI identify "dirt" related to a family member of the Victim and encouraged the PI to consider using a young member of the Victim's campaign staff to compromise the Victim. LIN emphasized again that his goal was to "cause [the Victim] to not make it in May" and to ensure that the Victim "won't be elected." I assess LIN's reference to "not mak[ing] it in May" alluded to the forthcoming primary elections.[6] With respect to funding the scheme, LIN indicated that "Whatever price is fine. As long as you can do it."

20. Following the call, LIN sent the PI the following voice message in which he suggested that the PI physically injure the Victim in the event that other efforts failed:

> Maybe when we speak on the phone tomorrow night, we need to confirm on some sort of plan. You, uh, do this. You can start thinking now, aside from violence, what other plans are there? Huh? But in the end, violence would be fine too. Huh? Beat him [chuckles], beat him until he cannot run for election. Heh, that's the-the last resort. You-you think about it. Car accident, [he] will be completely wrecked [chuckles], right? Don't know, eh, whatever ways from all different angles. Or, on the day of the election, he cannot make it there himself, right? The conclusion is, you think of a plan. We will make movements according to the plan. Okay? Right? We are just waiting for you now, uh, can we cooperate with each other's plans, to synchronize, okay.

21. On or about December 27, 2021, LIN sent the PI a link to an article about the presidential election in South Korea, and how a candidate's life was shattered because of his/her participation in the election. I am aware that personal scandals undermined the viability of multiple candidates in the most recent South Korean presidential election.

22. On or about December 31, 2021, the PI sent LIN a message indicating that "the proposal is done." In other words, the PI informed LIN that he had formulated a proposed plan for compromising the Victim's candidacy.

---

[6] The primary elections are currently scheduled for June 28, 2022.

23. On or about January 3, 2022, the PI participated in a monitored voice call with LIN to discuss the PI's proposal for undermining the Victim's candidacy. During the call, the PI proposed, in sum and substance, to hire a woman "that he [the Victim] likes" to volunteer to be part of his election staff in order to "have a relationship with him" and then "record the transaction between the two of them." When the PI stated that the woman would require $40,000, LIN responded, "No problem. The money is not a problem." LIN also indicated that "[t]he key is we do this now. Will our proposal be approved now?," indicating that he would need to have others involved in the scheme approve the specific plan developed by LIN and the PI.

24. On or about January 12, 2022, LIN spoke with the PI in a recorded voice call. At the start of the call, LIN indicated, "After conducting research, uh, the follow-up plan is not doable. Not doable. If things can be dug up from the existing foundation, then dig it up. If not, then put a temporary halt to it." I assess that LIN informed the PI that LIN's superiors in the scheme had rejected the proposed plan from the PI and that they directed LIN to continue gathering derogatory information about the Victim in the meantime.

25. On or about January 24, 2022, LIN spoke with the PI in a recorded call. In the call, the PI informed LIN that the Victim would hold a press conference about changing his election district to a district in Brooklyn within several weeks. The PI also said that, as LIN had mentioned before, if LIN wanted the Victim "to not be able to make it somewhere on a certain day," then the PI could try to make that happen—a reference to LIN's suggestion on or about December 24, 2021, that the PI should find a way to physically harm the Victim in order to undermine his candidacy. Additionally, the PI informed LIN that he had identified from the

Victim's past other derogatory information of the kind that LIN had previously requested.[7] The PI then asked if he should pursue this information further. LIN told the PI to wait for his response—an indication that he needed to consult with his superiors in the scheme.

26. On or about March 15, 2022, LIN and the PI spoke in a recorded call. During the conversation, LIN indicated, "They have not—-not given the final approval yet. Not yet final approved. Because at the time, [we] weren't sure where the price would end up at." LIN asked the PI for an itemized price quote and attributed the delay for approval of payment as follows: "Because the Communist Party, as you know, so many things . . . It's not just one person who can call the shots." He concluded the conversation by promising "lots of money" if the PI is "capable of getting things done."

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant QIMING LIN so that he may be dealt with according to law.

*Jason Moritz*
JASON MORITZ
Special Agent
Federal Bureau of Investigation

Sworn to before me by telephone this
16th day of March, 2022

*James R. Cho*
THE HONORABLE JAMES R. CHO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

---

[7] This purportedly derogatory information did not actually exist.

# UNITED STATES DISTRICT COURT
for the

Eastern District of New York

| | |
|---|---|
| United States of America<br>v.<br>**QIMING LIN**<br><br>*Defendant* | ) ) ) ) ) ) ) Case No. 22-MJ-251 |

## ARREST WARRANT

To: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)* QIMING LIN,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment  ☐ Superseding Indictment  ☐ Information  ☐ Superseding Information  ☑ Complaint
☐ Probation Violation Petition  ☐ Supervised Release Violation Petition  ☐ Violation Notice  ☐ Order of the Court

This offense is briefly described as follows:

18 USC 371 - Conspiracy to commit interstate harassment (in violation of 18 USC 2261A(2)(A) and (2)(B))

18 USC 1028(a)(7), (c)(3)(A), and (f) - Conspiracy and attempt to misuse a means of identification in connection with the conspiracy to commit interstate harassment

Date: 03/16/2022

*James R. Cho*
*Issuing officer's signature*

City and state: Brooklyn, New York

Hon. James R. Cho - USMJ
*Printed name and title*

---

**Return**

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____
at *(city and state)* _____.

Date: _____

_____
*Arresting officer's signature*

_____
*Printed name and title*

AO 442 (Rev. 11/11) Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender:

Known aliases:

Last known residence:

Prior addresses to which defendant/offender may still have ties:

Last known employment:

Last known telephone numbers:

Place of birth:

Date of birth:

Social Security number:

Height:                                                             Weight:

Sex:                                                                Race:

Hair:                                                               Eyes:

Scars, tattoos, other distinguishing marks:

History of violence, weapons, drug use:

Known family, friends, and other associates *(name, relation, address, phone number)*:

FBI number:

Complete description of auto:

Investigative agency and address:

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*:

Date of last contact with pretrial services or probation officer *(if applicable)*: